**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| CHARLES CULTURA, on his own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TIMEX GROUP USA, INC.,<br><br>Defendant. | No. 2:26-cv-00445-BJR<br><br>Honorable Judge Barbara J. Rothstein<br><br>FIRST AMENDED<br>CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Charles Cultrara, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of Defendant Timex Group USA, Inc., ("Timex") as follows:

## I. INTRODUCTION

1. In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2. Among other things, CEMA prohibits transmitting a commercial email with "false or



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

misleading information in the subject line" to the email address of a Washington resident. RCW 19.190.020(1)(b).

3. Defendant Timex engages in the precise activity which CEMA prohibits.

4. Timex spams Washington consumers, including Plaintiff, with commercial emails whose subject lines employ various tactics to create a false sense of urgency in consumers' minds—and ultimately, from consumers' wallets.

5. This false urgency wastes consumers' time by enticing them to engage with the defendant's marketing efforts for fear of missing out. It also floods consumers' email inboxes with repeated false notifications that the time to act—*i.e. purchase*—is short.

6. And through this deceptive time-sensitivity, Timex falsely narrows the field—steering consumers away from shopping for better deals—to its own products and services which must be purchased *now*.

7. Plaintiff challenges the defendant's harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II. JURISDICTION AND VENUE

8. Defendant has invoked this Court's jurisdiction under 28 U.S.C. §§ 1332, 1441, 1446, and 1453.

9. Venue is proper in the Western District of Washington under 28 U.S.C. § 1441 because this district and division embrace the place from which Defendant removed this action, King County Superior Court (Case No. 26-2-00971-6 SEA).



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

## III. PARTIES

10. Plaintiff Charles Cultrara is a resident of King County, Washington.

11. Defendant Timex Group USA, Inc., is a Delaware company with its principal address at 6 Armstrong Road, Third Floor, Shelton, CT 06484, and a registered agent at Corporation Service Company, 300 Deschutes Way, SW, Suite 208 MC-CSC1, Tumwater, WA, 98501.

## IV. FACTUAL ALLEGATIONS

### A. CEMA protects Washington consumers from deceptive spam emails.

12. The Supreme Court of Washington has made clear: "[A]ll Internet users … bear the cost of deceptive spam." *State v. Heckel*, 143 Wn. 2d 824, 835 (2001) (en banc).

13. In 1998, the Legislature found that the "volume of commercial electronic mail" was "growing," generating an "increasing number of consumer complaints." Laws of 1998, ch. 149, § 1.

14. While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, *i.e.* spam email, have grown exponentially.

15. The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers' attention away from the spam barrage to a message that entices consumers to click and, ultimately, *purchase*.

16. In 2003, the United States Congress found that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages." 15 U.S.C. § 7701(a)(8).

17. In 2012, one study estimated that Americans bear "costs of almost $20 billion annually" due to unsolicited commercial email. Justin M. Rao & David H. Reiley, *The Economics of Spam*, 26 J. of Econ. Perspectives 87, 88 (2012).



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

18. Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that "[m]ost privacy consent"—especially under the "notice-and-choice" approach predominant in the United States—"is a fiction." Daniel J. Solove, *Murky Consent: An Approach to the Fictions of Consent in Privacy Law*, 104 Boston Univ. L. Rev. 593, 596 (2024).

19. Consumers therefore routinely "consent" to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

20. This includes emails sent to consumers from businesses with which they have no prior relationship—by virtue of commercial data brokers and commercial data sharing agreements.

21. Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. "Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and … [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, 'we miss you' messages, and holiday promotions throughout the year. It's too much." Kaitlyn Wells, *Email Unsubscribe Services Don't Really Work*, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

22. The Legislature presciently intended CEMA to "provide some immediate relief" for these problems by prohibiting among other things commercial emails that "contain untrue or misleading information in the subject line." Laws of 1998, ch. 149, § 1.

23. CEMA thereby protects Washington consumers against the "harms resulting from deceptive commercial e-mails," which "resemble the type of harms remedied by nuisance or fraud actions." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

24. CEMA's "truthfulness requirements" increase the costs of sending deceptive commercial emails and thereby reduce their volume. *Heckel*, 143 Wn. 2d at 836.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

25. CEMA's "truthfulness requirements" thereby advance the statute's aim of protecting consumers "from the problems associated with commercial bulk e-mail" while facilitating commerce "by eliminating fraud and deception." *Id.*

26. CEMA "mean[s] exactly what it says": in "broad" but "patently clear" language, CEMA unambiguously prohibits "sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails." *Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC*, 567 P.3d 38, 44, 46–47 (Wash. 2025).

27. CEMA's protections do not depend on whether any email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. *See Harbers*, 415 F. Supp. 3d at 1011.

28. The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. *See Brown*, 567 P.3d at 44–45.

**B. The subject lines of Timex marketing emails make false time scarcity claims.**

29. One common way online marketers "manipulate consumer choice by inducing false beliefs" is to create a false sense of urgency or to falsely claim that consumers' time to act is scarce. Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 4 (2022), https://perma.cc/847M-EY69/; *see also* U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 26 (2022), https://perma.cc/V848-7TVV/.

30. The FTC has identified the "False Limited Time Message" as one example of false time scarcity claims, in which the marketer creates "pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon—but without a deadline or with a meaningless deadline that just resets when reached." *Bringing Dark Patterns to Light*, *supra*



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

para. 29, at 22.

31. "False or misleading scarcity claims can change the behavior of consumers." *Online Choice Architecture, supra* para. 29, at 27.

32. Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. *See, e.g.*, Huiliang Zhao *et al.*, *Impact of Pricing and Product Information on Consumer Buying Behavior with Consumer Satisfaction in a Mediating Role*, 12 Frontiers in Psychology 720151 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

33. False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 29, at 26.

34. Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by "induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit." *Id.*

35. Under time pressure, "consumers might take up an offer to minimise the uncertainty of passing it up." *Id.*

36. False time scarcity claims thus *harm consumers* by manipulatively distorting their decision-making to *their detriment—and the seller's benefit*.

37. Indeed, one 2019 study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at 27.

38. False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, "meaning that when a product [or offer] is truly scarce, the seller will not be able



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

to credibly communicate this information." *Id.*

39. These false time scarcity claims are a staple of the defendant's email scheme to compel consumers to purchase its products.

40. Timex is a watch manufacturer and retailer. The company's merchandise is available through other retailers as well as on Timex's website, timex.com.

41. To advertise its products and encourage purchases from timex.com, Timex sends spam emails to consumers.

42. **Urgent Spam Emails.** Unfortunately for those recipients, Timex regularly titles its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples discussed below.

43. Timex has tailored its approach to fit a number of offers, including promotion extensions. In these examples, Timex sends consumers email messages to advertise an offer, promotion, or sale. It uses the subject lines of its emails to present the promotional pricing as a scarce or time-limited opportunity. This strategy commands consumers' attention and pressures them to purchase from Timex's website. Finally, once the advertised "deadline" has passed, Timex extends the promotion to a new end date.

44. This misleading marketing strategy allows Timex to maximize sales during both the initial promotion, as well as the subsequent extension. While Timex may present these extensions as though they are a favor to consumers, they are anything but. By deploying false time pressure with surprise extensions, Timex compels consumers to purchase quickly while withholding terms that consumers need so they can make informed buying decisions. A Halloween-themed 31% off promotion from 2024 provides an apt example of the strategy at work.

45. First, Timex sends consumers an email advertising a new promotion and announcing



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

the promotion's deadline. It did so on October 31, 2024, in an email titled: "Today Only 31% OFF 👻 Spooky Vibes, Spooky Sale[.]" Text within the message provided a code which consumers could use to obtain reduced pricing on select watches during the purported "flash sale."

46. As one email cautioning consumers about the promotion's end wasn't enough for the defendant, Timex continued to assert false time pressure on consumers in a follow-up email sent later that same day.

47. On the evening of October 31, 2024, Timex sent another email with the subject line: "Ending Soon 31% OFF 🎃[.]" The same discount code was provided within the body of the email. To ensure consumers understood that "ending soon" meant October 31, large text within the body of the email reiterated that the promotion was in its "FINAL HOURS[.]"

48. However, Timex never intended for the promotion to be a single-day sale.

49. In short order, Timex also provided proof of its own lie.

50. First, "Terms & Conditions" provided at the bottom of the email sent on the evening of October 31, 2024, confirmed that Timex planned for the sale to continue beyond the advertised due date. The text stated that the offer "expires on 11/3/24 at 3AM ET."

51. So, consumers couldn't rely on the "Today Only" claims made in the earlier October 31 subject line. They couldn't rely on the "Ending Soon" claim made in the later October 31 subject line. Consumers also couldn't rely on the "FINAL HOURS" claim made in the body of the latter email because Timex did not—and never planned to—end the sale on October 31, 2025.

52. Both October 31 subject lines urged consumers to purchase from Timex's website by warning them that the opportunity was coming to an end.

53. Despite these multiple, unambiguous warnings, October 31, 2024, was not the expiration date for the 31% off promotion.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

54. Timex provided proof of its lie on the following day.

55. In the final stage of its scheme, Timex replaces the advertised deadline with the real deadline, purportedly extending the life of the promotion. For the 31% off sale, Timex announced the "extension" on November 1, 2024, in an email titled: "Sale EXTENDED 🎉 31% OFF[.]" Text within the message confirmed that the offer would actually expire on November 3, 2024.

56. So, one day after warning consumers that the sale was ending, Timex extended the sale, thereby proving the falsity of the October 31, 2024, subject lines. Consumers in receipt of the October 31 emails were not at risk of missing the discount because Timex did not end the promotion on October 31, as advertised. The false conclusion of the 31% off promotion was simply a marketing strategy meant to compel consumers to purchase items from the defendant's website.

57. Timex redeployed the same scheme in 2025.

58. On October 31,2025, Timex transmitted an email with the subject line: "31% OFF Today Only 👻 Spooky Vibes, Spooky Sale[.]" Fine print located at the bottom of the email stated that the "[o]ffer expires on November 1, 2025[,] at 3AM ET."

59. Later, on the evening of October 31, 2025, Timex sent yet another email emphasizing the purported deadline. The message was titled: "Last Chance for 31% OFF!!" Again, text within the email informed consumers that the offer would expire at 3AM ET on November 1, 2025.

60. Again, the deadline communicated in both emails was false.

61. Confirmation that the advertised expiration date was false arrived in consumers' inboxes on November 1, 2025. A message sent on that date bore the title: "Flash Sale Extended 🙌 31% OFF For 48 Hours(.)" The body of the email advised that the 31% sale was not yet over while fine print at the bottom provided the actual deadline: "Offer expires on November 3, 2025[,] at 3AM ET."



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

62. Thus, both November 1, 2025, subject lines concerning the 31% off sale were false. The sale did not end as the emails warned.

63. By filling consumer inboxes with such misinformation, Timex ensures that email recipients lack the accurate details needed to make educated buying decisions.

64. More recently, Timex applied its deceptive strategy to a "Merry Monday Sale" in December 2025.

65. On December 8, 2025, it sent an email with the subject line: "30% OFF Today Only 🙌 Merry Monday Sale[.]" The message included a discount code that consumers could use to obtain the discount on "(ALMOST) EVERYTHING)" on the Timex website. Text at the top of the email clearly stated that the sale "Ends Tonight[,] while fine print at the bottom stated that the offer "expires on December 9, 2025[,] at 3AM ET[.]"

66. Later that same day, Timex ratcheted up the time pressure by sending consumers an email titled: "Last Chance! 30% OFF Merry Monday Sale[.]" Text within the message provided the same December 9 end date. Despite the clear warning, December 9 was not consumers' last chance to participate in the promotion.

67. The real end date for the 30% off sale was provided on December 9, 2025, in a message bearing the title: "Sale Extended!! 30% OFF Is Still On[.]" The heading proved the falsity of the December 8 subject lines while the body of the email revealed the true deadline for the promotion: "Offer expires on December 10, 2025[,] at 3AM ET[.]" So, despite the finality first touted by Timex, consumers had additional time to participate in the sale.

68. Timex has leveraged false time pressures against consumers with other promotions as well. In some instances, the defendant pressures consumers to buy quickly—because the opportunity to receive an offer is coming to an end—only to advertise the same or better terms

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

shortly thereafter.

69. An example occurred during the recent holiday season.

70. On November 30, 2025, Timex transmitted an email with the title: "Last Chance for Black Friday 30% OFF[.]" The message provided consumers with a promo code which they could use to obtain 30% off "(ALMOST) Everything) on Timex's website. According to fine print at the bottom of the email, the "[o]ffer expires on December 1, 2025[,] at 12AM ET."

71. Yet, the very next day, on December 1, 2025, Timex announced a Cyber Monday sale offering the same discount. The email included the heading: "Today Only: 30% OFF + NEW Watches Added to Sale 💥 [.]" Again, consumers were provided with a promo code which they could use to obtain 30% off "(ALMOST) Everything)" on Timex's website. According to the email, the Cyber Monday promotion would expire on December 2, 2025, at 3AM ET.

72. The misleading nature of these communications couldn't be clearer. A consumer in receipt of the November 30, 2025, email is urged to buy quickly because the subject line advises that the reduced pricing is ending soon. However, the very next day, the same reduced pricing was available again.

73. This is a time-honored strategy for Timex. It used the same ploy in December 2022.

74. On December 8, 2022, Timex sent at least two emails with subject lines containing false time scarcity claims.

75. The first email was titled: "30% OFF Digital Watches | 24 HOURS ONLY[.]" Inside, the email confirmed that the promotion was a "flash sale" lasting "Today Only[.]" Small text at the bottom of email provided that the offer was "[v]alid online 12/8 at 12AM ET through 12/9/22 at 3AM ET."

76. Later that evening, Timex transmitted another email with the subject line: "30% OFF



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

Digital Watches | Final Hours!" The email's preview text reiterated that the offer "Ends Tonight!" while small text at the bottom of the email repeated the same deadline: "Valid online 12/8 at 12AM ET through 12/9/22 at 3AM ET."

77. Yet, within days, Timex returned to consumers' inboxes to advertise the same discount for a *wider* variety of items.

78. An email sent on December 12, 2022, featured the subject heading: "30% OFF Today Only!" Text within the message provided a coupon code that recipients could use to access the special pricing and stated that the promotion was for "(almost) everything!"

79. Thus, the December 8, 2022, subject lines misleadingly claimed that the 30% off pricing for digital watches was limited to a single day. Yet, in just a few days, the same discount rate was available again and on a wider variety of merchandise.

80. Timex transmitted a misleading subject line earlier that year as well.

81. On June 13, 2022, it sent an email with the heading: "Hurry! 20% Off Summer Sale is ending soon[.]"

82. However, rather than using the email's subject line to deliver reliable information, Timex leveraged it to mislead consumers with false time pressure. Small text at the bottom of the email revealed that the promotion wasn't ending anytime soon: "Valid online through 06/20/2022 at 3AM ET."

83. So, despite the urgency reflected in the June 13, 2022, subject line, consumers had roughly a week left during which they could obtain the advertised discount.

84. 2023 brought more of the same.

85. On November 25, 2023, Timex sent an email titled: "Last Chance! Black Friday 30% OFF[.]" The email provided a code that consumers could use to obtain 30% off "Almost



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

Everything" on Timex's website. A graphic within the email further warned that it was the "LAST CHANCE" for the sale.

86. Yet, it was not consumers' last chance to obtain 30% off "almost everything" on Timex's website. The Cyber Monday sale which followed the Black Friday Sale offered the same discount as confirmed in a November 27, 2023, email titled: "30% OFF Ends Tonight!" Again, the same special pricing was available for "Almost Everything!" as explicitly stated in the email's preview text.

87. Thus, the November 25, 2023, subject line was meant to mislead consumers about the availability of discount pricing. Within two days, the same 30% discount was available again on "almost everything" on Timex's website.

88. Timex deployed the same trickery the following month.

89. On December 8, 2023, Timex sent at least two emails advertising a "Flash Sale" which offered 30% off women's watches.

90. The earlier message was titled: "24 Hour Flash Sale ⚡ 30% OFF Women's Watches[.]" A flashing graphic within the email and its preview text emphasized that the offer was "Today Only!"

91. A message sent later on December 8, 2023, held the subject line: "Final Hours! 30% OFF Women's Watches[.]" The email featured the same flashing graphic while the preview text reiterated that the opportunity "Ends Tonight[.]"

92. Yet, in typical fashion, Timex proved that the 30% discount was not a scarce opportunity and it certainly wasn't contained to December 8. By December 11, 2023, Timex was offering the same discount rate during a more inclusive sale. An email sent on that date was titled: "30% OFF 🚨 24 Hour Flash Sale!" The message confirmed that the special pricing was available



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

on "Almost Everything."

93. As these promotions demonstrate, Timex employs a strategy where it pressures consumers to purchase products from its website by falsely representing the limited availability of its offers; offers that are repackaged, repeated, and redeployed.

94. These and other examples of the commercial emails that Timex has sent consumers containing subject lines with false or misleading statements are attached to this Class Action Complaint as Exhibit A.

**C. Timex knows when it sends emails to Washington residents.**

95. A sophisticated commercial enterprise, like Timex, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

96. First, the sheer volume of email marketing that Timex engages in put it on notice that Washington residents would receive its emails.

97. Second, Timex may obtain location information tied to email addresses when consumers make purchases from Timex through digital platforms, including the Timex website, or otherwise self-report such information to Timex.

98. Third, Timex may obtain location information tied to email addresses by tracking the IP addresses of devices used to open its emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

99. Specifically, Timex likely uses Klaviyo to manage its email marketing campaigns. This platform informs Timex where the recipients of its marketing emails are located using IP geolocation and other data extracted from recipients' interactions with Timex, which Klaviyo



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

tracks in detail.[1] Thus, this platform should allow Timex to access a list of every email address that was sent a marketing email. It should also allow Timex to determine who viewed the emails and who clicked on any links within them.

100. Timex is likely able to infer the general geographic location of recipients by state based on their IP address at the time of email open or link click.

101. Fourth, Timex may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

102. Fifth, Timex may obtain location information tied to email addresses by using "identity resolution" services offered by companies such as LiveRamp, which can connect consumers' email addresses to their physical locations, among other identifiers.

103. Sixth, Timex may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients' email addresses. *See* RCW 19.190.020(2).

104. It is thus highly probable that a seller with the size and sophistication of Timex employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

**D. Timex violated Plaintiff's right under CEMA to be free from deceptive commercial emails.**

105. Timex has spammed Plaintiff with commercial emails whose subject lines contain false or misleading statements in violation of his right to be free from such annoyance and

[1] *See* "Understanding when and how Klaviyo sets a profile's location," Klaviyo (July 7, 2025) (describing "how a profile's location and timezone information are set and updated"), https://help.klaviyo.com/hc/en-us/articles/115005073907/; "Understanding profiles in Klaviyo," Klaviyo (Aug. 5, 2025) ("Each individual profile features an activity log to capture a timeline of their interactions with your business," including receiving emails, opening emails, and clicking links within emails.), https://help.klaviyo.com/hc/en-us/articles/115005247088/.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

harassment under CEMA.

106. Plaintiff received a number of the email promotions described above in Section B, including:

a. The December 8, 2023, email titled, “24 Hour Flash Sale ⚡ 30% OFF Women's Watches[,]” as discussed in paragraph 90.

b. The December 8, 2023, email titled, “Final Hours! 30% OFF Women's Watches[,]” as discussed in paragraph 91.

c. October 31, 2024, email titled, “Today Only 31% OFF 👻 Spooky Vibes, Spooky Sale[,]” as discussed in paragraphs 44 to 56.

d. The October 31, 2025, email titled, “31% OFF Today Only 👻 Spooky Vibes, Spooky Sale[,]” as discussed in paragraphs 58 to 62.

e. The October 31, 2025, email titled, “Last Chance for 31% OFF!!” as discussed in paragraphs 58 to 62.

f. The November 30, 2025, email titled, “Last Chance for Black Friday 30% OFF[,]” as discussed in paragraphs 68 to 72.

g. The December 8, 2025, email titled, “30% OFF Today Only 🙌 Merry Monday Sale[,]” as discussed in paragraphs 64 to 67.

h. The December 8, 2025, email titled, “Last Chance! 30% OFF Merry Monday Sale[]” as discussed in paragraphs 64 to 67.

107. These emails were false or misleading in violation of CEMA, for misrepresenting the timing of the deals and as further described herein.

108. These emails contained false statements of fact as to the “duration or availability of a promotion.” *Brown*, 567 P.3d at 47.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

## V. CLASS ALLEGATIONS

109. Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class ("Class"):

> All Washington citizens holding an email address to which Defendant sent or caused to be sent any email listed in Exhibit A during the Class Period.

110. Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

111. The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

112. Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

113. The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

114. There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a *per se* violation of the Consumer Protection Act, RCW 19.86.020 (CPA); and whether Defendant should be enjoined from such conduct.

115. Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendant



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

116. Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; has no interest adverse to the Class; and has retained competent counsel extensively experienced in consumer protection and class action litigation.

117. Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

118. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

119. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action as a class presents no special difficulties.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

## VI. CLAIMS TO RELIEF

### First Claim to Relief

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

120. Plaintiff incorporates and realleges paragraphs 1–108 above.

121. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

122. Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

123. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

124. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents as such "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address." RCW 19.190.020(b)(2).

125. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

126. For Defendant's violation of CEMA, Plaintiff is entitled to all available relief,



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

including an injunction against further violations.

**<u>Second Claim to Relief</u>**

**Violation of the Consumer Protection Act, RCW 19.86.020**

127. Plaintiff incorporates and realleges paragraphs 1–108 above.

128. The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020.

129. A violation of CEMA is a *per se* violation of the CPA. RCW 19.190.030.

130. A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. *Wright v. Lyft*, 189 Wn. 2d 718 (2017).

131. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

132. Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

133. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

134. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

135. Defendant initiated the transmission, conspired with another to initiate the



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

136. For Defendant's violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII. JURY DEMAND

137. Plaintiff demands a jury trial by separate document in accordance with Local Civil Rule 38.

## VIII. PRAYER FOR RELIEF

Plaintiff asks that the Court:

A. Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B. Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C. Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D. Award Plaintiff's costs of suit, including reasonable attorneys' fees; and

E. Order such further relief the Court finds appropriate.

*[Counsel signatures to follow on next page.]*



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

Date: April 9, 2026

*/s/ Samuel J. Strauss*
Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops (*pro hac vice*)
Natalie A. Lyons*
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenmalad.com
lyons@cohenmalad.com
ibensberg@cohenmalad.com

J. Gerard Stranch, IV*
Michael C. Tackeff*
Andrew K. Murray*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com

*Counsel for Plaintiff and the Putative Class*

*** Applications for admission *pro hac vice* forthcoming**



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

**CERTIFICATE OF SERVICE**

I, Samuel J. Strauss, hereby certify that, on this date, I caused the foregoing to be electronically filed with the Court using the Court's CM/ECF system which will send an electronic copy to all parties and/or their counsel of record.

DATED this 9th day of April, 2026.

Respectfully submitted,

*/s/ Samuel J. Strauss*

Samuel J. Strauss, WSBA No. #46971
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com